**STATE OF ILLINOIS et al. v. UNITED STATES et al.**
**Civ. No. 51 C 1316.**

United States District Court
N. D. Illinois, E. D.
Oct. 31, 1951.

Judgment Affirmed Feb. 4, 1952.
Sec 342 U.S. 930, 72 S.Ct. 377.

Homewood, Hazelcrest and Riverdale and Cities of Chicago Heights, Blue Island and Harvey.

Joseph F. Grossman, Sp. Asst. Corp. Counsel, Chicago, Ill., for City of Chicago.

J. Stanley Payne, Associate Chief Counsel, Interstate Commerce Commission, Washington, D. C., H. G. Morison, Asst. Atty. Gen., James E. Kilday and John E. Baecher, Sp. Assts. to Atty. Gen., Otto Kerner, Jr., U. S. Atty., Chicago, Ill., Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, Washington, D. C., of counsel, for defendants.

J. H. Wright, C. A. Helsell, John W. Freels, Herbert J. Deany and Erle J. Zoll, Jr., Chicago, Ill., for Illinois Cent. R. Co.

Before FINNEGAN, Circuit Judge, and CAMPBELL and PERRY, District Judges.

PERRY, District Judge.

This action was brought by the State of Illinois and the Illinois Commerce Commission pursuant to U.S.C.A. §§ 1336, 1398, 2284, 2321, 2322, 2323, 2324 and 2325. The City of Chicago, Chicago Heights, Blue Island, Harvey, the villages of Flossmoor, Park Forest, Matteson, Homewood, Hazelcrest and Riverdale, and the Illinois Central Commuters' Committee intervened on behalf of the complainants and joined with them in their prayer for relief. The United States of America, the Interstate Commerce Commission and the Illinois Central Railroad, a corporation, are defendants.

The complainants and intervening petitioners all seek by this action to enjoin the Interstate Commerce Commission from carrying out its order granting increased suburban rates to the Illinois Central Railroad after full and extended hearings, findings and conclusions. The Interstate Commerce Commission's action was taken upon the petition of the Illinois Central Railroad, a carrier, pursuant to authority of 49 U.S.C.A. § 13, which provides as follows:

Sec. 13(3): "Whenever * * * in any investigation instituted upon petition of the carrier concerned, which petition is hereby authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice, made

Ivan A. Elliott, Atty. Gen., Wm. R. Ming Jr., Sp. Asst. Atty. Gen., Milton Mallin, Asst. Atty. Gen., Jordon Jay Hillman, Chicago, Ill., of counsel, for State of Illinois and Illinois Commerce Commission.

Johnson & Wiles, Chicago, Ill., for Villages of Flossmoor, Park Forest, Matteson,

or imposed by authority of any State, the commission, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding. The commission may confer with the (regulatory) authorities of any State * * * with respect to the relationship between rate structures and practices of carriers subject to the jurisdiction of such State bodies and of the commission; and to that end is authorized and empowered * * * to hold joint hearings with any such State regulating bodies on any matters wherein the commission is empowered to act and where the rate-making authority of a State is or may be affected by the action taken by the commission. * * * "

Sec. 13(4) : "Whenever in any such investigation the commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is * * * forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding."

There are only two questions presented in this proceeding: (1) Did the Interstate Commerce Commission have the authority or power to enter an order on July 30, 1951, fixing suburban rates on the Illinois Central Railroad in Chicago and the vicinity thereof after a petition, notice and hearing pursuant to 49 U.S.C.A. § 13? (2) Did the Interstate Commerce Commission hold a full hearing and receive such substantial evidence as would support its findings, conclusions and order?

1. If the Interstate Commerce Commission had no such authority or power under the aforesaid section of the United States statute to hold such hearings, make such findings of fact and conclusions of law and enter such order for multiple and commutation fares as it did on July 30, 1951, then the prayer of the complainants for an injunction restraining the Interstate Commerce Commission and Illinois Central Railroad from putting the order into effect should be granted.

On the other hand, if the Interstate Commerce Commission is held to have such authority or power, then the prayer for such injunction should not be granted until it is determined whether the Interstate Commerce Commission held a full hearing upon the petition of a proper party, gave lawful notice, made findings and conclusions and entered an order based upon substantial evidence such as would support its findings, conclusions and order.

The record reveals that the petitioner is a carrier and that all legal notices were given. If it shall be determined that the Interstate Commerce Commission has authority or power to hold such hearing, make the findings and conclusions and enter the order that it did on July 30, 1951, the only remaining question is, did it hold a full hearing and base its findings, conclusions and order upon such substantial evidence as would support its final order?

Much has been said about the fact that multiple and commutation fares are largely if not wholly intrastate commerce and that the action of the Interstate Commerce Commission was invading the sovereign authority of the State of Illinois in holding hearings, making findings and conclusions and entering an order for multiple and commutation fares different and, in general, on a considerably increased basis as compared to the same fares in force pursuant to the action of the Illinois Commerce Commission, an intrastate body. The position of the complainants on that score is untenable, and has been so since the United States Supreme Court rendered its decision in the

Shreveport case cited as Texas & Pacific Railway Co. v. U. S., 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341. That was six years before the passage of subsections (3) and (4) of section 13 of Title 49 U.S.C.A., commonly known as the National Transportation Act. It is generally conceded that the principles of the Shreveport case were codified by the National Transportation Act.

 In that case, where the Interstate Commerce Commission found that intrastate rates established by the Texas commission were unduly and unjustly discriminatory to interstate commerce travelling over the same area, the court held that Congress through the Interstate Commerce Commission had the power to examine and to make determinations in order to resolve the conflict between the state and national authorities on such questions. The court cited the historical principle that, in order to avoid the problems which overwhelmed the Confederation, to relieve interstate trade from the impediments resulting from rival local governments and to provide a basis for national unity and an insurance against conflicting and discriminating state legislation, Congress was given a comprehensive grant of power over interstate commerce. The court emphasized the fact that this power reaches not only interstate commerce itself, but also such related matters as might affect the security, the efficiency and the maintenance of interstate commerce. In this Shreveport case the court, at page 351 of 234 U.S., at page 836 of 34 S.Ct., said: "The fact that carriers are instruments of intrastate commerce, as well as of interstate commerce, does not derogate from the complete and paramount authority of Congress over the latter, or preclude the Federal power from being exerted to prevent the intrastate operations of such carriers from being made a means of injury to that which has been confided to Federal care. Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the state, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority, and the state, and not the nation, would be supreme within the national field."

It is the view of this court that the facts of the instant case bring it clearly within the purview of the above principle enunciated by the Supreme Court, even if the National Transportation Act had never been passed. It is unnecessary for the court to do more than note that this principle was approved by two later cases before the passage of the National Transportation Act: Amercian Express Co. v. State of S. D. ex rel. Caldwell, 244 U.S. 617, 37 S.Ct. 656, 61 L.Ed. 1352; and Illinois Central Railroad Company v. Public Utilities Commission of Illinois, 245 U.S. 493, 38 S.Ct. 170, 62 L.Ed. 425.

The leading United States Supreme Court case on the controversy between intrastate and interstate commerce that was heard after the passage of the National Transportation Act was the case of Railroad Commission of State of Wisconsin v. Chicago, Burlington & Quincy Railroad Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371. In that case the court had before it the question as to whether or not the Interstate Commerce Commission had the power or authority to examine the relationship between intrastate rates and interstate rates under the provisions of 49 U.S.C.A. § 13, subsections (3) and (4) and, further, the question as to whether or not the Interstate Commerce Commission had the power or authority to make determinations with respect to these intrastate rates after it had found that they constituted unlawful discrimination against interstate commerce. In upholding the proposition that the Interstate Commerce Commission did have such power and authority, Justice Taft, at page 588 of 257 U.S., at page 237 of 42 S. Ct., said: "It is objected here, as it was in the Shreveport Case, that orders of the Commission which raise the intrastate rates to a level of the interstate structure violate the specific proviso of the original Interstate Commerce Act repeated in the amending acts, that the Commission is not to regulate traffic wholly within a state. To this, the same answer must be made as was made in the Shreveport Case, 234 U.S. 342, 358, 34 S.Ct. 833, 58 L.Ed. 1341, that such

orders as to intrastate traffic are merely incidental to the regulation of interstate commerce and necessary to its efficiency. Effective control of the one must embrace some control over the other in view of the blending of both in actual operation. The same rails and the same cars carry both. The same men conduct them. Commerce is a unit and does not regard state lines, and while under the Constitution, interstate and intrastate commerce are ordinarily subject to regulation by different sovereignties, yet when they are so mingled together that the supreme authority, the Nation, cannot exercise complete effective control over interstate commerce without incidental regulation of intrastate commerce, such incidental regulation is not an invasion of state authority or a violation of the proviso."

In the argument before this Court the case of Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 71 S.Ct. 762, 767, 95 L.Ed. 1002, was urged as a recent case showing a different viewpoint on the problem of federal authority over intrastate activities. That case was not brought under the Transportation Act. No hearing occurred before the Interstate Commerce Commission under 49 U.S.C.A. § 13. The suit was one in which the plaintiff sought to go into a federal district court and enjoin the action of the Public Service Commission of the State of Alabama, which had entered an order refusing to permit the Southern Railway to discontinue certain trains. The court in a special footnote specifically stated: "As the jurisdiction of the Interstate Commerce Commission under 49 U.S.C. § 13(4), 49 U.S.C.A. § 13(4), has not been invoked for decision as to whether the continuance of this intrastate service constitutes an undue discrimination against interstate commerce we cannot, in this proceeding, consider any impact the order of the Alabama Public Service Commission might have on interstate commerce."

It is therefore clear that the court did not intend its decision in that case to alter or change in any way the principles that have been consistently followed in the interpretation of the National Transportation Act.

The plaintiffs and intervening petitioners have maintained that this court is without jurisdiction for the reason that the Illinois Commerce Commission reached a different conclusion upon the same facts and that there is now pending an appeal from its decision in the Circuit Court of Cook County.

It is sufficient for this court to point out that the result of that proceeding can in no way affect the jurisdiction of this court or the power and authority of the Interstate Commerce Commission. The Circuit Court of Cook County may sustain the Illinois Commerce Commission, but that makes no difference. The power and authority of the Illinois Commerce Commission and jurisdiction of the Circuit Court of Cook County are limited to interpreting and applying the statutes of the State of Illinois, creating and giving power to the Illinois Commerce Commission. It may very well be that, under the Illinois law, the Illinois Commerce Commission's report and findings are proper. Even if the Circuit Court of Cook County had already sustained the report of the Commission and the matter had been finally concluded the Interstate Commerce Commission would still have the power and authority under 49 U.S.C.A. § 13(4), to hear the petition in the instant case, and this court would have jurisdiction to determine whether or not the findings, conclusions and order of the Interstate Commerce Commission were founded upon and warranted by substantial evidence.

It is entirely possible that the Circuit Court of Cook County could reverse the Illinois Commerce Commission; and, the Illinois Commerce Commission might conceivably order higher rates than those ordered by the Interstate Commerce Commission. The Circuit Court of Cook County and the Supreme Court of Illinois might sustain the state administrative body in such action; in that case the railroad might obtain higher rates than those granted by the Interstate Commerce Commission herein. That would be legal and proper under our dual system of government unless and until a further action could be instituted under the provisions of 49 U.S.C.A. § 13(4), wherein a proper showing might be made

that the new and higher rates interfered in a prejudicial manner with interstate commerce.

This court would not have the jurisdiction to determine the rates under the Illinois law or to set aside or alter the findings, conclusions or orders either of the Illinois Commerce Commission or of the Circuit Court of Cook County, if the petitioner relied upon diversity of citizenship or the due process clause of the Federal constitution as was done in the case of Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002. There is no question of comity involved in the case at bar for the reason that the Interstate Commerce Commission has the power and authority to enter the order herein under 49 U.S.C.A. § 13(4) regardless of whether it is the state law or merely the administration of the state law that interferes with interstate commerce in a prejudicial manner.

█ Without reciting or repeating the findings of fact, the court emphasizes the fact that it has been found that the railroad's multiple and commutation fares are not producing their fair share of the earnings required to enable the railroad to meet its maintenance and operating costs and to yield a fair return on the value of the property devoted to the transportation service, both interstate and intrastate, and hence are discriminatory revenuewise against its interstate traffic. The provisions of 49 U.S.C.A. § 13(4), are especially designed to counteract just this type of situation; they prescribe the method whereby such unjust discrimination against interstate commerce shall be relieved, and that is the method used in the instant case.

█ This court concludes that the Interstate Commerce Commission had the power and authority under the provisions of 49 U.S.C.A. § 13(4), to entertain the petition, hold the hearings, make the findings and conclusions and enter the order which it did.

█ This court has carefully examined the voluminous transcript of testimony taken and the numerous exhibits examined and considered as evidence by the Inter-

state Commerce Commission, ever mindful of the decision in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. From such examination the court is convinced that the order of the Interstate Commerce Commission meets a high standard of certainty and is founded upon substantial evidence, and that the order as well as the findings and conclusions of the commission were warranted by the evidence. This court finds that the Interstate Commerce Commission was clearly justified in making the findings and conclusions and entering the order that it did. This court makes no attempt to weigh the evidence in this case, for to do so would be to substitute its judgment as to matters of fact for that of the Interstate Commerce Commission, which the Supreme Court has repeatedly held we cannot do.

Accordingly, this court finds the issues for the defendants and files herewith its findings of fact and conclusions of law.

The prayers for injunction sought herein are denied, and the complaint and intervening petitions are dismissed for want of equity.

### Findings of Fact.

1. This is an action by the State of Illinois and the Illinois Commerce Commission against the United States of America and the Illinois Central Railroad Company to suspend, enjoin, set aside and annul the order of the Interstate Commerce Commission dated July 30, 1951, in its Docket No. 30560, entitled Illinois Central Multiple Fares in Chicago Area, the report of which appears in 281 I.C.C. 537.

2. The order directs the Illinois Central Railroad Company, hereinafter sometimes called ICRR or petitioning carrier or petitioner, (1) to cease and desist from practicing the undue, unreasonable, and unjust discrimination found to exist by finding No. 4 of the report, namely, that the multiple and commutation fares of the Illinois Central Railroad Company for intrastate travel between stations on its suburban lines within the State of Illinois, made or imposed by authority of that State, cause and, unless increased to the extent set

forth in said report, will continue to cause undue, unreasonable, and unjust discrimination against interstate commerce, in violation of the provisions of paragraph (4) of section 13 of the Interstate Commerce Act; and (2) to establish and maintain for intrastate travel between points in Illinois on its suburban lines multiple and commutation fares on the bases referred to in finding No. 5 of said report, namely, that such undue, unreasonable, and unjust discrimination can and should be removed by establishing for such intrastate travel the multiple and commutation fares on the bases set forth as "prescribed" in the Appendix to said report.

3. The order prescribes 10-trip, 25-trip, and 50-trip (twin-25) multiple fares and weekly and restricted and unrestricted monthly commutation fares, as shown in the Appendix to the report, for application for intrastate travel between points in Illinois on the suburban lines of the Illinois Central Railroad Company. The Commission found, among other things, that said prescribed fares will yield a return after taxes of about 3.2 percent, and an average increase of about 20 percent, or $1,300,000 per annum, which the Commission found to be the approximate measure of the revenue discrimination against interstate commerce resulting from the present multiple and commutation fares of the Illinois Central Railroad Company.

4. The proceeding in which this order was issued was initiated by a petition, such as expressly authorized by section 13(3) of the Interstate Commerce Act, filed with the Interstate Commerce Commission on March 3, 1950, by the Illinois Central Railroad Company, a common carrier by railroad engaged in the transportation in interstate commerce of freight and passengers in Illinois and various other states, with lines of railway extending from Chicago, Ill., to New Orleans, La., from Chicago to Council Bluffs, Iowa, and to many other points in various states. It is also engaged in intrastate commerce in Illinois, including the transportation of passengers over its suburban lines extending from Chicago to Richton, Ill., 29 miles, with branches from 67th Street to South Chicago, 4.9 miles, and from 115th Street (Kensington) to Blue Island, Ill., 4.3 miles. In its said petition it alleged that its then prevailing round-trip, commutation, and multiple-ride rates, fares and charges applicable to intrastate transportation of passengers within the Chicago suburban area were then resulting and would continue to result in (a) undue and unreasonable advantage, preference and prejudice as between persons and localities in intrastate commerce in Illinois, on the one hand, and interstate commerce, on the other, and (b) undue, unreasonable and unjust discrimination against and a burden upon interstate commerce, in violation of section 13(3) and (4) and sections 3 and 15a of the Interstate Commerce Act. Said petition prayed that the Interstate Commerce Commission institute an investigation under section 13 (3), and, by appropriate order under section 13(4), require the removal of the alleged violations of the Interstate Commerce Act by authorizing and requiring (a) the establishment, in lieu of its then existing commutation and multiple-ride tickets and the fares applicable thereto, 10-ride, 25-ride, and 50-ride (twin-25) tickets at increased fares, and (b) the elimination of its then existing round-trip tickets and fares therefor (then on the basis of 180 percent of its one-way fares).

■ The petition was assigned for hearing and on due notice was heard before an examiner of the Interstate Commerce Commission beginning on May 11, 1950, and continuing for 25 days thereafter in July, August, September, October and November, 1950. At said hearing the Illinois Central Railroad Company, petitioner, by its counsel; the Illinois Commerce Commission, by the Attorney General of Illinois, the Assistant Attorney General of Illinois and a Special Assistant Attorney General of the State of Illinois; the City of Chicago, by its Special Assistant Corporation Counsel; the Villages of Flossmoor, Hazelcrest, Park Forest and Homewood, Ill., the City of Harvey, Ill., and the Illinois Central Commuters' Committee, through their attorney, and others, appeared and participated in the proceeding.

6. A large volume of testimony, covering several thousand pages, and numerous documentary exhibits were introduced by the parties at said hearing. All of the evidence therein introduced has been presented to this Court.

7. After the completion of the hearings briefs were submitted by the parties and an examiner's proposed report was issued and served, in which the examiner found that the suburban fares in question were unduly low and caused undue prejudice against persons and localities in interstate commerce and unjust revenue discrimination against interstate commerce, and recommended that said prejudice and discrimination should be removed by certain increases in the intrastate fares in question but not in all instances to the level proposed by the petitioning carrier.

8. Exceptions to the examiner's proposed report were filed by the Illinois Commerce Commission, the City of Chicago, the Village of Flossmoor, et al., and the petitioning carrier. On May 28, 1951, oral argument was presented to the Interstate Commerce Commission at Washington, D. C.

9. On July 30, 1951, the Commission issued its report, supra, containing its findings of fact, conclusions and decisions in the premises, and with it the order involved in this suit.

10. In its report the Commission made findings of fact, based upon the evidence, describing the suburban service in question and explaining in detail the various types of fares applicable thereto, the amounts thereof, and the types of tickets and fares proposed by the petitioning carrier. The Commission also considered the mass of evidence bearing on the question of the cost to the petitioning carrier of performing the suburban service, and in the report found and concluded "that the cost (operating expenses and taxes) incurred by petitioner in 1949, ascribable to its suburban service, as reasonably as may be approximated, exceeded its revenues for that year by about $335,000." This latter figure does not include an amount of $207,756 shown by the evidence to be interest on funded debt attributable to the suburban properties directly pledged as security for funded debt.

11. The report also considers evidence submitted by the protestants intended to show that certain maintenance-of-way and equipment expenditures in 1949, as shown in petitioner's evidence, were abnormal, and the report made findings and rulings upon this subject, including the finding that "In any event, suburban maintenance expenditures at the 1949 level or higher are now necessary and will be necessary for the foreseeable future, in order to provide adequate service for petitioner's current passengers."

12. The report also makes findings and conclusions upon a mass of evidence intended to show the net credit that should be accorded the suburban service for the transportation of non-suburban employees, and the report contains the finding that $248,271 may, under all the circumstances, be accepted as substantially accurate for the purposes of the proceeding.

13. The report considers and makes findings upon a mass of evidence relating to the valuation of the property devoted to the suburban service, and finds, after giving due consideration to all the evidence as to elements of value, that, for the purposes of these proceedings, the value of petitioner's property devoted to the suburban service is about $35,000,000.

14. The report finds that in 1949 petitioner earned on its entire system a net railway operating income of about $25,000,000, yielding a return of 3.23 percent on its estimated rate-making value, and 4.4 percent on its recorded investment less depreciation.

15. The report also makes the following finding: "Even giving full consideration to protestants' criticisms as to general expenses, normal maintenance, and non-revenue passengers, the return from this surburban service is far lower than that from petitioner's system operations and, under the fares approved herein, will still be somewhat lower than the return from its nonsuburban operations."

16. The report finds that the petitioning railroad's present multiple fares are far below those recently prescribed for the Chicago & North Western Railway Company between Chicago and points in Illinois and Wisconsin in Commutation Fares between Chicago and Wisconsin, 279 I.C.C. 773, decided December 15, 1950. The report further finds that the present multiple fares of the petitioning railroad are in many instances so low that the corresponding through fares of the Chicago, South Shore & South Bend Railroad Company are higher than the combination of the fares of the latter railroad from stations on its line, such as Hammond, Gary, Michigan City and South Bend, Ind., to 115th Street, plus the ICRR's fare beyond. To illustrate this fact the report gives a single example, viz., from Gary, Ind., the 10-trip fare of the Chicago, S. S. & S. B. R. R. Co. to Randolph Street is $8, and its 10-trip fare to 115th Street is $5.15, while the ICRR's 10-trip fare between 115th Street and Randolph Street is $2.58, resulting in a combination of $7.73.

17. The report finds that the present ICRR commutation fares are lower than the fares prescribed by the Interstate Commerce Commission in any recent proceeding, among which are Commutation Fares between Chicago and Wisconsin, 279 I.C.C. 773, referred to above, New York Central Commutation Fares, Chicago and Indiana, 279 I.C.C. 188, decided October 24, 1950, and Chicago, S. S. & S. B. R. Fares, 279 I.C.C. 663, decided December 4, 1950, prescribing commutation fares in the Chicago area, and Commutation Fares, Eastern Railroads, 278 I.C.C. 491, decided June 29, 1950, prescribing interstate commutation fares to and from eastern cities, and New York State Commutation Fares, New Haven Railroad, 279 I.C.C. 151, decided October 9, 1950, prescribing, under section 13(4) of the Interstate Commerce Act, intrastate fares for application over the New York, New Haven & Hartford Railroad between New York City and points in New York equal in amount to similar interstate fares for comparable distances previously prescribed for application between New York City and points in Connecticut in Increased Passenger Fares, Eastern Railroad, 269 I.C.C. 87 (1947). The report further finds that despite the low level of said present commutation fares of the ICRR in the Chicago area, there is practically no travel thereunder for the shorter hauls due to the still lower level of the present multiple fares of said carrier.

18. The report finds that while there was a steady increase in the number of passengers carried on the petitioner's suburban lines for 20 years following 1926, the number has since declined, 47,067,959 passengers having been carried in 1946 and 37,893,715 in 1949. This decline in recent years is ascribable to the growing trend toward the five-day week and to the increase in the use of private automobiles.

19. The report finds that the quality of petitioner's suburban service is somewhat superior to that afforded by the street car and elevated lines and busses operating in the Chicago area and that the record is convincing that petitioner's traffic will bear some increases but not to the full extent proposed by petitioner.

20. The report finds that in 1949 petitioner incurred a deficit from its entire passenger train service of about $13,000,000 or much greater, absolutely and relatively, than the deficit incurred from its suburban operations.

21. The report finds that petitioner's basic passenger fare, 2.5 cents per mile in coaches, is the same as the Interstate Commerce Commission has approved for other railroads in the South and West (in Increased Coach Fares on Western Railroads, 269 I.C.C. 632, decided in February 1948), and is generally much higher than the ICRR's suburban fares at present in effect, or those proposed by that carrier in this proceeding or those approved and prescribed in the order here involved.

22. The report finds that petitioner's multiple and commutation fares are not producing their fair share of the earnings required to enable petitioner to meet its maintenance and operating costs and to yield a fair return on the value of the property devoted to the transportation serv-

ice, both interstate and intrastate, and hence are discriminatory, revenuewise, against its interstate traffic as a whole. The report reaches the conclusion that under the circumstances it is not only within the power of the Interstate Commerce Commission, but it is its duty, to require that the discrimination be removed, citing Wisconsin R. R. Comm. v. Chicago, B. & Q. R. R. Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371; Florida v. United States, 282 U.S. 194, 212, 214, 51 S.Ct. 119, 75 L.Ed. 291; Florida v. United States, 292 U.S. 1, 5, 54 S.Ct. 603, 78 L.Ed. 1077; North Carolina v. United States, 325 U.S. 507, 514–515, 65 S.Ct. 1260, 89 L.Ed. 1760.

23. The report finds that in Commutation Fares between Chicago and Wisconsin, 279 I.C.C. 773, and related State proceedings, the Interstate Commerce Commission prescribed for the Chicago & North Western Railway Company 10- and 25-trip multiple fares made 5 and 11½ times the corresponding round-trip fares, and that the Interstate Commerce Commission and the Illinois Commerce Commission approved unrestricted monthly commutation fares ranging from $3.85 for 3 miles, to $7.20 for 6 miles, and $19.20 for 29 miles.

24. In the report the Commission found and concluded, giving due consideration to petitioner's revenue needs, the nature, cost, and value of its suburban service, and the history and comparison of fares, that the unjust discrimination found in said report to exist can and should be removed by the establishment and maintenance of 10-, 25-, and 50-trip multiple fares on the bases proposed by petitioner, as shown in Table I of the Appendix to the report, subject, respectively, to maxima of 5, 11½, and 23 times the corresponding round-trip fares, and of unrestricted monthly commutation fares ranging from $6 for distances of 6 miles and under to $17 for 29 miles, with weekly and restricted monthly fares made the customary 25 and 90 percent thereof, all as set forth in the said Appendix.

25. The report finds that the fares thus prescribed will average somewhat lower than those of the Chicago & North Western Railway Company and considerably lower than those prescribed for the east-ern railroads, including the Chicago, South Shore & South Bend Railroad Company and the New York Central Railroad Company in the Chicago area.

26. The report finds that the fares prescribed therein will be lower than the basic (coach) fare [of 2.5 cents per mile] applying over petitioner's lines generally, will result in substantially increased revenue, and are necessary to enable petitioner to earn an adequate return over and above the cost of carrying the travelers thereunder so that it may maintain its well-being and be in a position to attract capital, in other words, so that its suburban operations may be self-supporting and have a long-term survival value; otherwise the burden of supporting the suburban operations must rest largely on petitioner's interstate freight traffic.

27. The report finds that the fares approved therein will yield a return after taxes of about 3.2 percent, and an average increase of about 20 percent or $1,300,000 per annum, which the Interstate Commerce Commission finds to be the approximate measure of the revenue discrimination against interstate commerce resulting from petitioner's present multiple and commutation fares.

28. The Commission's ultimate findings, as set forth in said report, are as follows:

"1. That petitioner has not shown that its proposed increased minimum fare on interstate traffic will be just and reasonable.

"2. That in connection with its minimum and round-trip suburban fares petitioner has not shown any person-locality or revenue discrimination against interstate commerce.

"3. That petitioner's present multiple and commutation fares do not produce sufficient revenue to cover the cost of providing the service for the current revenue travel thereunder, including a reasonable return on the rate-making value of the property devoted to such service.

"4. That such multiple and commutation fares for intrastate travel between stations on petitioner's suburban lines within the State of Illinois, made or imposed by authority of that State, cause and, unless in-

creased to the extent herein set forth, will continue to cause undue, unreasonable, and unjust discrimination against interstate commerce, in violation of the provisions of paragraph (4) of section 13 of the Interstate Commerce Act.

"5. That such undue, unreasonable, and unjust discrimination can and should be removed by establishing for such intrastate travel the multiple and commutation fares on the bases set forth as prescribed in the appendix hereto.

"6. That such prescribed fares will be just and reasonable for the future, will produce substantial additional revenue, and are necessary for the future in order that the travel thereunder may make a fair contribution to the revenues needed by petitioner to meet its increased operating expenses due to increases in wages and in prices of materials and supplies and to enable it, under honest and efficient management, to provide adequate and efficient service at the lowest cost consistent with the furnishing of such service.

"7. That such prescribed fares will remove any person-locality discrimination against interstate commerce which may exist in connection with petitioner's present multiple and commutation fares."

Conclusions of Law.

1. This Court has jurisdiction of the parties and of the subject matter of this action.

2. The Interstate Commerce Commission has been vested by the Congress of the United States, in section 13(3) and (4) of the Interstate Commerce Act, 49 U.S.C.A. § 13(3) and (4), with jurisdiction and power to determine whether any intrastate rate, fare, or charge, imposed by State authority upon any common carrier by railroad engaged also in interstate commerce and hence subject to the provisions of the Interstate Commerce Act, Part I, 49 U.S.C.A. § 1 et seq., causes either (a) undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand, and interstate or foreign commerce on the other, or (b) undue, unreasonable or unjust discrimination against interstate or foreign commerce, and if, in any investigation instituted by the Interstate Commerce Commission upon petition of the carrier concerned, it finds, after full hearing, that any such rate, fare, or charge causes any such advantage, preference, prejudice, or discrimination, to prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum thereafter to be charged which will, in its judgment, remove such advantage, preference, prejudice, or discrimination, such rate, fare, or charge so prescribed to be observed while in effect by the carrier party to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding.

3. The Interstate Commerce Commission, in the aforesaid proceeding instituted pursuant to the petition of the Illinois Central Railroad Company under the provisions of section 13(3) of the Interstate Commerce Act, has properly exercised the jurisdiction conferred upon it by section 13(4) of that Act and has determined that petitioner's prevailing intrastate suburban multiple and commutation fares are not producing their fair share of the earnings required to enable petitioner to meet its maintenance and operating costs and to yield a fair return on the value of the property devoted to the transportation service, both interstate and intrastate, and that in consequence thereof said fares are discriminatory, revenuewise, against its interstate traffic as a whole, and that said fares cause, and, unless increased to the extent specified by the Interstate Commerce Commission in the order here involved, will continue to cause, undue, unreasonable, and unjust discrimination against interstate commerce, in violation of the provisions of section 13(4) of the Interstate Commerce Act.

4. Upon consideration of the entire record of the evidence introduced before the Interstate Commerce Commission, the Court finds that said evidence is substantial and amply supports each of and all of the ultimate findings and subsidiary findings set forth in the report of the Interstate Commerce Commission of July 30, 1951.

5. The findings of the Interstate Commerce Commission as referred to hereinabove and its other findings appearing in its aforesaid report of July 30, 1951, are adequate to support its order.

6. The report and order of the Interstate Commerce Commission of July 30, 1951, do not violate the provisions of the Tenth Amendment or other provision of the Constitution of the United States, are within and do not exceed the powers delegated to the Interstate Commerce Commission by statute, and do not constitute an exercise of power in itself or in the manner of its exercise so arbitrary and capricious as to transcend the authority conferred upon said Commission.

7. The Interstate Commerce Commission did not act arbitrarily, unlawfully, or beyond the scope of the authority vested in it by section 13(3) and (4) of the Interstate Commerce Act in not dismissing the petition filed with it under section 13(3) on March 3, 1950, by the carrier involved, pending a final determination by State authority of the rates to be charged on petitioner's suburban system.

8. The Interstate Commerce Commission did not err or act arbitrarily or unlawfully, or beyond the scope of its authority, in prescribing rates which it found will be just and reasonable for the future, will produce substantial additional revenue, and are necessary for the future in order that the travel thereunder may make a fair contribution to the revenues needed by petitioner to meet its increased operating expenses due to increases in wages and in prices of materials and supplies and to enable it, under honest and efficient management, to provide adequate and efficient service at the lowest cost consistent with the furnishing of such service, and to remove the undue, unreasonable and unjust discrimination found by the Interstate Commerce Commission to be caused by the present multiple and commutation fares of the petitioning carrier, made or imposed by authority of the State.

9. The order in question is within the statutory powers of the Interstate Commerce Commission, which powers were properly exercised after full hearing in the proceeding culminating in the order here involved, without error in the application of the rules of law, and the order is valid in every respect.

10. Unjust discrimination against interstate commerce is a matter of National and not exclusively local concern, and whether intrastate rates cause such discrimination is properly for determination by the Interstate Commerce Commission.

11. The pendency of a suit in the local courts of the State of Illinois to set aside a report and order of the Illinois Commerce Commission which refused to permit the Illinois Central Railroad Company to make any changes or increases in its presently existing suburban fares in the Chicago area did not in any manner affect the power or jurisdiction of the Interstate Commerce Commission under section 13(3) and (4) of the Interstate Commerce Act; and it was within the power of the Interstate Commerce Commission, and it was its duty, having found upon substantial evidence the existence of an unjust discrimination against interstate commerce, caused by the suburban fares in question which had been made and imposed under authority of the State of Illinois, to prescribe the rate or fare to be charged in the future in order to remove such unjust discrimination.

12. The injunction should be denied and the complaint should be dismissed.

## Decree.

The above action came on for hearing before the duly constituted three-judge statutory court, sitting in the United States Court for the Northern District of Illinois, at Chicago, on September 12, 1951, and subsequent hearings and having been submitted by counsel for plaintiffs and intervening plaintiffs and defendants and intervening defendant, upon the pleadings, the certified portions of the Interstate Commerce Commission record, as offered by the defendants, and upon briefs and arguments of counsel, and the Court having duly considered the issues so presented and the law and facts relating thereto, and being fully advised in the premises and having entered its Findings of Fact and Conclusions of

48

Law, to the effect that the complaint herein should be dismissed.

It is therefore ordered, adjudged and decreed that the injunction prayed for herein be denied and the complaint herein be, and the same is, hereby dismissed, at the cost of plaintiffs.