Sidney B. LIFSCHULTZ, Ida Lifschultz, Bernice Brown, Rose Grossman, Nora Bergman, and American National Bank and Trust Co. of Chicago, as Executor of the Estate of Samuel E. Lifschultz, deceased, as co-partners doing business as Lifschultz Fast Freight, Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

United States District Court
S. D. New York.
June 21, 1956.

608

Reich, Spitzer & Feldman, New York City (M. James Spitzer and Jack B. Levitt, New York City, of counsel), for plaintiffs.

Stanley N. Barnes, Asst. Atty. Gen., Paul W. Williams, U. S. Atty. for Southern Dist. of New York, New York City, James E. Kilday and John Bodner, Jr., Attys., Dept. of Justice, Washington, D. C., for defendant United States.

Robert W. Ginnane, Gen. Counsel, Leo H. Pou, Associate Gen. Counsel, I. C. C., Washington, D. C., for defendant Interstate Commerce Commission.

James L. Givan, Washington, D. C., and S. S. Eisen, New York City, for intervenors, Acme Fast Freight, Inc., and Universal Carloading & Distributing Co., Inc.

Before LUMBARD, Circuit Judge, and NOONAN and HERLANDS, District Judges.

HERLANDS, District Judge.

This is an action to enjoin and vacate and annul a report and two orders of the Interstate Commerce Commission.

The question to be decided is: Did the Interstate Commerce Commission properly deny plaintiffs' application for a territorial enlargement of plaintiffs' permit

because of the applicant's prior illegal transactions?

The parties before us are: (1) the plaintiffs-partners of Lifschultz Fast Freight, who will be referred to collectively in this opinion as "the applicant"; (2) the defendants, United States of America and Interstate Commerce Commission, who will be referred to for purposes of this opinion as "the Commission"; and (3) two intervenors, Acme Fast Freight, Inc. and Universal Carloading & Distributing Co., Inc., who will be referred to as "the intervenors."

The facts are detailed in the administrative proceedings heretofore had herein, which are reported in 285 I.C.C. 569 and 285 I.C.C. 659. We shall refer only to such facts as are necessary for the determination of the question before us.

This action is brought under 28 U.S.C.A. §§ 1336, 1398, and 2321–2325. By it the applicant seeks to have the Court (1) enjoin the Commission; (2) set aside and annul the following report and orders of the Commission: a report and order made on July 6, 1955 [285 I.C.C. 659] and an order denying reconsideration made on December 5, 1955; and (3) remand the matter to the Commission with instructions to grant the applicant's application for extended operating authority and to issue an amended permit authorizing the same. The Commission seeks to dismiss the complaint.

On June 10, 1953, the applicant filed an application (subsequently amended on September 9, 1953) whereby it sought to extend its freight forwarder's permit to include additional territory for which it did not then have operating authority. Prior to the filing of the application here involved, the applicant had authority to operate as a freight forwarder of general commodities between points in Maryland, Pennsylvania and the United States north and east thereof, and certain limited points in southern Wisconsin, northern Illinois, and northwestern Indiana, and in Iowa along the west bank of the Mississippi River; also between other areas (Minnesota, Texas and California)

not here pertinent. By the application in issue, the applicant sought permission to extend its service as a freight forwarder between the eastern area already served and all points in Iowa, Michigan, and Wisconsin, not already included in its operating authority.

Shortly after the application was filed, three freight forwarders filed protests in opposition. (Two of these protestants are intervenors in the case at bar.) In the administrative proceedings, seventeen motor common carriers intervened in opposition to the application.

Hearings were held before a Commission examiner on October 19 and 20, 1953, in New York City, and on November 5 and 6, 1953, in Milwaukee. On March 16, 1954, the examiner filed a proposed report, recommending that the application be granted. After considering exceptions filed by the applicant, various intervenors and the protestants, and after oral argument, the Commission filed its report on October 19, 1954, granting the application. 285 I.C.C. 569.

Between the latter date and July 6, 1955, there were various proceedings which resulted in the reopening of the matter. On July 6, 1955, the Commission decided to deny the application, 285 I.C.C. 659; and on December 5, 1955, the Commission filed its order denying the applicant's petition for reconsideration.

The report proposed by the examiner on March 16, 1954 was rejected by the Commission in so far as it sought to impose the surrender of one of the applicant's permits (an *unused* permit to service points in Texas, Minnesota and California) as a condition to the granting of the applied-for extension of authority in Wisconsin, Iowa, and Michigan. But the report proposed by the examiner was accepted by the Commission—both in its original decision of October 19, 1954 and its reconsidered decision of July 6, 1955—with respect to the critical finding and conclusion that the applicant, prior to filing the application, had engaged in illegal westbound shipments to Iowa and Wisconsin during the period

between August 1, 1953 and September 4, 1953. These shipments, one hundred and twelve in number, had originated in the applicant's authorized Eastern territory, but were destined to points in Iowa and Wisconsin *outside* the applicant's authorized territory. The illegality of these shipments and the effect to be given that illegality are the crux of the case.

Each of the shipments that were found to be illegal involved freight movements from a point of origin and receipt within the applicant's territory to a break-bulk or distribution point (such as Chicago or Milwaukee) within the applicant's territory, and thence by motor common carrier to the point of ultimate destination which was *outside* the authorized area. The last segment of the movement—from the break-bulk point to the point of destination—was, in each of the condemned transactions, beyond the last point of the applicant's authorized service.

It was and is the applicant's contentions that the challenged westbound shipments were lawful because: (A) the applicant had not published through traffic rates applicable to such shipments; (B) the rate paid was a combination of rates, covering a movement from point of receipt to the break-bulk point and another movement from the break-bulk point to the point of destination; (C) the truckman used in making the last haul, from break-bulk point to the point of destination, had been selected, in most instances, by the consignor or consignee, and only in a minority of instances by the applicant; (D) the applicant had disclaimed responsibility for the last haul and had manifested that disclaimer by inserting upon the shipping documents the name of the ultimate consignee "in care of" a truckman, whose noted address was within the applicant's authorized territory; (E) the applicant had not issued a through bill of lading covering such shipments beyond the break-bulk point; and (F) by virtue of all of the foregoing circumstances, the applicant did not render service as a freight forwarder during that segment of the movement

from the break-bulk point to the point of ultimate destination, and hence the applicant did not operate beyond its authorized territory.

The above contentions by the applicant were rejected by the examiner and the Commission in both its original and reconsidered decisions. Those administrative authorities held that the applicant had been required to issue a through bill of lading covering each such shipment; that the applicant could not effectively have disclaimed responsibility for a shipment to its point of ultimate destination; and that the services rendered by the applicant in connection with each of such shipments, which included arranging for the movement from the break-bulk point to the point of destination, constituted freight forwarding beyond the applicant's authority.

The original report (October 19, 1954) of the Commission stated, 285 I.C.C. at 575–576:

"It is clear that a freight forwarder must issue a through bill of lading or receipt for property received by it for transportation in forwarder service. Once the property is in the possession of the forwarder, such property must stay in its possession or control either physically or theoretically to the ultimate destination. This is so whether the final delivery is made by the forwarder or by a motor carrier acting as the forwarder's agent. Consequently, the freight forwarder cannot relinquish responsibility for a shipment short of the ultimate destination."

The reconsidered report (July 6, 1955) expressed precisely the same conclusion in almost the same words. 285 I.C.C. at 663–664.

Thus, the Commission, both in its original and reconsidered decisions, and the examiner were in accord that the applicant had engaged in illegal shipments. However, the Commission, in its first decision, and the examiner took the position that the applicant's illegal acts

should be forgiven, and that the applicant should be admonished but found to be qualified. Upon reconsideration, the Commission reversed itself to the extent of holding that, in view of the applicant's illegal activities in the face of two prior warnings, the applicant "has failed to establish that it is qualified, or that the proposed operation as a freight forwarder in interstate commerce would be consistent with the public interest and the national transportation policy." The Commission declared: "We are convinced, on reconsideration, that sound administration of the act requires more than admonishment in the instant proceeding." 285 I.C.C. at 665.

We therefore turn to a consideration of the two fundamental questions—whether the finding of illegality was supported by substantial evidence, considering the record as a whole; and whether the Commission's final disapproval of the application, predicated upon that illegality, was a proper exercise of the Commission's judgment in the light of the applicable statutory criteria and standards.

In determining that the applicant had acted as a freight forwarder with respect to the movements from the break-bulk point within the authorized area to the point of ultimate destination outside that area, the Commission properly rejected as without merit the applicant's argument based upon its non-publication of through rates and its alleged disclaimer of responsibility for the final haul. See Judson-Sheldon Corp. Application, 260 I.C.C. 473, 476–478 (1945). The Commission, no less than the Court, was required to pierce the surface appearance of the transactions and the form of the bill of lading in order to determine the real character of the regulated business. Baer Bros. Mercantile Co. v. Denver R. G. R. Co., 1914, 233 U.S. 479, 490–491, 34 S.Ct. 641, 58 L.Ed. 1055; Illinois Cent. R. Co. v. De Fuentes, 1915, 236 U.S. 157, 35 S.Ct. 275, 59 L.Ed. 517. The regulatory power cannot be defeated by a subterfuge or stratagem.

The vital inquiry concerns the actual nature of the service between the point of disassembly or break-bulk, which was within the authorized territory, and the point of ultimate destination, which was outside the authorized territory. When an individual shipment is distributed from the break-bulk point to the point of destination by a connecting motor common carrier, this last segment of the haul must be viewed realistically as a part of the freight forwarder's total operation. The applicant in the case at bar would like to consider the significance of that last segment isolated from the antecedent processes and services which brought the shipment to the break-bulk point, where it was turned over to the connecting carrier. With this contention we do not agree.

A proper appraisal of the record requires a restatement of the very nature of a freight forwarder's service. The freight forwarder does not engage in actual transportation. His function is to arrange for transportation by affording to individual consignors who ship less-than-truckload quantities the economies that can be effected by consolidating or bulking such freight into larger shipments for the purpose of moving them to common points of distribution or delivery.

A forwarder shipment is received at a point of origin or pick-up point. This may be either the place where the freight forwarder maintains its assembly station or terminal; or it may be some other point where, usually, a motor common carrier will accept the shipment and bring it to the assembly terminal. When the shipment arrives at the freight forwarder's assembly terminal, the individual shipments are consolidated, depending upon their destination, and routing is arranged. When the consolidated shipments arrive at the freight forwarder's distribution or disassembly terminal nearest the point of ultimate destination, they are separated. At this break-bulk point, arrangements are made to have the individual shipments picked up by a con-

necting common carrier, who makes delivery to the consignee at the point of ultimate destination.

■ A freight forwarder issues a bill of lading to the consignor, acknowledging the receipt of the shipment and agreeing to transport or deliver it at a specified place to the named consignee. See definitions in Federal Bills of Lading Act, § 42, 49 U.S.C.A. § 122. A "through" bill of lading is one whereby the freight forwarder agrees to transport the goods from the point of origin to the designated point of destination, although such transportation may extend over the lines of connecting carriers. 9 American Jurisprudence, Carriers, 662, 663.

Where the point of origin is within the freight forwarder's authorized territory, the freight forwarder provides service from that point of origin by: (A) undertaking at the point of origin to initiate the process which ends with the delivery to the ultimate consignee named in the bill of lading; (B) undertaking at the point of origin to turn over the shipment at the break-bulk point to a connecting carrier; (C) arranging for and actually turning over the shipment at the break-bulk point to the connecting carrier; (D) making and facilitating the payment to the connecting carrier and attending to the incidental but necessary clerical details, such as providing information as to weight, shipping instructions, name and address of the consignee, paying or advancing the charges. Each of such services is rendered in connection with, and is an inseparable part of, a shipment from point of origin to point of destination, covered by the freight forwarder's bill of lading. The essence of the freight forwarder's function is to act as a liaison and arranger, as distinguished from an actual carrier. The freight forwarder "forwards" by making arrangements for packing, shipping, distributing, turning over to and receiving from connecting carriers. That the turning over by the freight forwarder at a break-bulk point to a connecting carrier for delivery to the consignee at a point of destination con-

stitutes part of the freight forwarding operation simply recognizes the realities of the business.

■ Title 49 U.S.C.A. § 1002(a) (5) (A) specifically includes as one of the elements of the term "freight forwarder," the undertaking whereby the freight forwarder "*provides for* the performance of * * * *distributing operations.*" (Emphasis supplied.) Thus, the aspect of the case covered by evidence relating to the applicant's providing for the performance of distributing operations by turning over the shipments at break-bulk points in Milwaukee and Chicago to carriers who would then deliver the shipments to points outside of the applicant's authorized area, constitutes one of the elements encompassed within freight forwarder service. Such service, to be lawful, must be performed within the territorial limits for which the freight forwarder has authority. 49 U.S.C.A. § 1010(a, e).

■ Title 49 U.S.C.A. § 1002(a) (7) expressly states that the term " 'service subject to this chapter' " does not include that part of the freight forwarder's undertaking for the performance of which the transportation by motor vehicle "when incidental to transportation by aircraft" is utilized. The fair implication is that, where a freight forwarder utilizes the services of a motor common carrier in performing that part of the forwarder's undertaking relating to "distributing operations" other than transportation by aircraft, the utilization of motor vehicle transportation is comprehended within freight forwarder's " 'service subject to this chapter' ", and falls within the scope of the forwarder's permit.

The applicant argues that the eastbound and westbound shipments were "identical" and that the Commission erroneously condemned the westbound shipments while approving the eastbound shipments. This argument overlooks a basic distinction. In the case of eastbound shipments that originated at points outside the applicant's authorized

territory and were brought to applicant's assembly terminals at Chicago and Milwaukee, the applicant issued a bill of lading only at Chicago or Milwaukee, and that bill covered the shipment from such point of receipt to the respective point of destination, both of which points were *within* the applicant's authorized territory. Thus, the applicant assumed no responsibility for shipments in respect to movements outside his territory.

On the other hand, in the case of the challenged westbound shipments which originated within the applicant's territory but were destined to points outside applicant's authorized area, the applicant was required to issue through bills of lading; and it was responsible for the shipments to their respective points of destination, which latter points were outside the applicant's authority.

The responsibility referred to in the latter instances is predicated upon: (A) the provisions of the statute, as interpreted by the Supreme Court; (B) the express order of the Commission, and (C) the record considered as a whole, which supports the proposition that the applicant either actually issued through bills of lading covering the shipments in question or must be deemed to have issued such bills.

■ The applicable statutory provisions are 49 U.S.C.A. §§ 20(11) and 1013. Section 1013 applies the provisions of the Carmack Amendment, § 20 (11), to freight forwarders. Section 1013 expressly provides that "the freight forwarder shall be deemed both the receiving and delivering transportation company for the purposes of section 20 (11) * * *." The combined effect of § 20(11) and § 1013 is to impose upon the applicant responsibility for a shipment from its point of receipt to its point of destination. That responsibility rests upon the applicant, according to § 20(11), whether the mandatory bill of lading "has been issued or not".

The Supreme Court has had occasion to point out that a carrier or transportation agency covered by § 20(11) is required to issue a through bill of lading. Northern Pacific Railway Co. v. Wall, 1916, 241 U.S. 87, 36 S.Ct. 493, 60 L.Ed. 905; St. Louis, Iron Mountain & Southern Railway Co. v. Starbird, 1917, 243 U.S. 592, 37 S.Ct. 462, 61 L.Ed. 917. Mr. Justice Van Devanter said, in the Northern Pacific case, supra, 241 U.S. at page 92, 36 S.Ct. at page 495:

> "The Carmack Amendment to the interstate commerce act (§ 7, chap. 3591, 34 Stat. 584, 595), * * * directs a carrier receiving property for interstate transportation to issue a *through* bill of lading therefor, although the place of destination is on the line of another carrier; * * *." (Emphasis supplied.)

Mr. Justice Day said, in the St. Louis, Iron Mountain & Southern Railway Co. case, supra, 243 U.S. at page 604, 37 S.Ct. at page 467:

> "The Carmack Amendment requires the receiving carrier to issue a *through* bill of lading, and makes that bill of lading the contract of shipment, * * *." (Emphasis supplied.)

The Interstate Commerce Commission has relied on the above cited Supreme Court decisions in interpreting §§ 20(11) and 1013 as requiring a freight forwarder to issue a through bill of lading. Bills of Lading of Freight Forwarders, 259 I.C.C. 277, 281 (1944). But the Commission has gone further: it has duly issued a specific order requiring the issuance of through bills of lading by a freight forwarder.

Part IV of the Interstate Commerce Act, 49 U.S.C.A. §§ 1001–1022, known as the Freight Forwarder Act, was added on May 16, 1942, 56 Stat. 284. The following year, on June 7, 1943, the Commission issued an order (Docket No. 28990) calling for an "investigation" and making "all freight forwarders" respondents to that proceeding. The Commission was concerned because "there is no uniformity in the practices of freight forwarders in the issuance of bills of lading on forwarder traffic." The inves-

tigation was "into and concerning the reasonableness and lawfulness otherwise of the rules, regulations, and practices affecting the issuance of bills of lading or shipping receipts for forwarder traffic by freight forwarders or their agents together with the forms of such bills of lading and shipping receipts, with a view to making such findings in the premises and prescribing such just, reasonable, and otherwise lawful provisions as the facts and circumstances shall appear to warrant. This investigation [concerns] * * * only the issuance of bills of lading or shipping receipts to the original shipper of the goods covering the transportation for which the forwarder assumes responsibility."

The report of that investigation, including a discussion and the findings of fact, appears in Bills of Lading of Freight Forwarders, 259 I.C.C. 277 (1944). Pursuant to that report, the Commission directed the entry of an order, which was issued on December 5, 1944, and which we quote in full:

"Order

"At a General Session of the Interstate Commerce Commission, held at its office in Washington, D. C., on the 5th day of December, A. D. 1944.

"No. 28990
"Bills of Lading of Freight Forwarders

"*It appearing*, That by order dated June 7, 1943, the Commission entered upon an investigation concerning the reasonableness and lawfulness of the rules, regulations, and practices affecting the issuance of bills of lading or shipping receipts for forwarder traffic by freight forwarders of their agents;

"*It further appearing*, That a full investigation of the matters and things involved has been made and that the Commission on the date hereof has made and filed a report containing its findings of fact and conclusions thereon, which said report is hereby referred to and made a part hereof:

"*It is ordered*, That

"TITLE 49—Transportation and Railroads
"CHAPTER 1—Interstate Commerce Commission
"Subchapter D—Freight Forwarders
"Part 431—Bills of Lading

"Sec.
"431.1 Through bills of lading to be issued.
"431.2 Conflicting regulations and practices to be discontinued.

"Authority: 56 Stat. 286, 295; 49 U.S.C. 1004, 1013.

"§ 431.1 *Through bills of lading to be issued.* All freight forwarders subject to part IV of the Interstate Commerce Act participating in the transportation of property in interstate commerce are required, on or before April 1, 1945, and thereafter, to maintain and apply on all shipments moving under forwarder rates in interstate commerce, rules, regulations, and practices providing for the issuance to the shipper, at the initial point of origin, of a through bill of lading, covering the transportation from initial point of origin to ultimate destination, either by the freight forwarder on its form, or by a motor common carrier on its form with a notation thereon showing the name of the freight forwarder in whose service the shipment is moving. Where a motor common carrier receives property at initial point of origin and issues a receipt therefor on its form, with a notation thereon showing the name of the freight forwarder in whose service the shipment is moving, the freight forwarder, upon receiving the shipment at the 'on line' or consolidating station, shall issue a through bill of lading on its form as of the date the shipment is received at initial point of origin.

"§ 431.2 *Conflicting regulations and practices to be discontinued.* All freight forwarders subject to Part IV of the Interstate Commerce Act according as they participate in the transportation of property in interstate commerce are hereby notified and required to cease and desist on or before April 1, 1945, and thereafter to abstain from publishing or applying rules, regulations, and practices affecting the issuance of bills of lading or shipping receipts which are in conflict with the provisions of § 431.1.

"*And it is further ordered,* That this order shall remain in force and effect until the further order of the Commission."

The above order, at all of the times involved herein and up to the present, has been and is in full force and effect.

■■■ In appraising the evidence adduced at the administrative hearings herein, it is appropriate to observe that, since the law makes it the duty of a freight forwarder to issue a through bill of lading, "the presumption is that such duty was complied with." Southern Pacific Co. v. Stewart, 1917, 245 U.S. 359, 362, 38 S.Ct. 130, 131, 62 L.Ed. 345. Moreover, "the laws in force at the time and place of the making of a contract, and which affect its validity, performance, and enforcement, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." And a bill of lading is a contract "within this rule." Northern Pacific Railway Co. v. Wall, 1916, 241 U.S. 87, 91–92, 36 S.Ct. 493, 495, 60 L.Ed. 905.

■■■ The term " 'service subject to this chapter' ", as defined in § 1002(a)(7), includes any service in connection with the transportation in interstate commerce which a freight forwarder is *"required by* or under the authority of this chapter to perform or provide." (Emphasis supplied.) Inasmuch as the Commission's order of December 5, 1944 *requires* a freight forwarder to issue "a through bill of lading, covering the transportation from initial point of origin to ultimate destination," that mandatory act of issuance and the concomitant assumption of responsibility constitute an element of the service of a freight forwarder "subject to" the Freight Forwarders Act and the Carmack Amendment.

The phrase "in the case of service subject to this chapter" means the service of a freight forwarder functioning as a forwarder as distinguished from the service of the underlying rail or motor common carriers, who are utilized by the forwarder. The case of Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Acme Fast Freight, Inc., 1949, 336 U.S. 465, 69 S.Ct. 692, 93 L.Ed. 817, relied on by the applicant, simply pointed out the above distinction and explained that a freight forwarder possesses a dual character: he is a forwarder vis-à-vis the shipper or consignor who engages his service; but, in turn, the forwarder is himself a shipper vis-à-vis the rail or motor common carriers whose service he utilizes in performing his role of forwarder.

That the applicant held itself out to the public as providing service to points beyond the scope of its authority is plainly indicated upon the record by the following testimony of S. B. Lifschultz, the applicant's chief managerial and operating partner: "We lend ourselves out to serve the middle west, where we only have a fraction of the coverage in the middle west. By the extension of this application [sic], we will actually serve what some of our literature implies." Hearings, page 215.

Moreover, in describing the direct and indirect personnel employed in the applicant's business, this witness stated that the applicant has "truckmen who deliver it [freight] *beyond the territories we are permitted* * * *."* Hearings, page 190.

This witness also testified that "it is not our general policy to solicit freight beyond our * * * territories," adding: "If, however, a customer will come to us who is dissatisfied with his present

arrangements and ask us *to handle a shipment into a territory beyond, we will try to help him out"* and "That would be true of westbound shipments." Hearings, page 274.

Lifschultz testified further that, in the case of shipments offered to the applicant in New York City for delivery to "off-line stations *outside of the area which we serve,"* the applicant accepts about ten per cent of such offers, turning away about ninety per cent of such offered freight. Hearings, page 275.

The testimony of Lifschultz about the kind of bills of lading which were issued by his firm in the case of westbound shipments destined to points outside applicant's authorized territories was clearly unsatisfactory. His testimony sought to present the picture that when goods were received by the applicant and they were destined to a point beyond the applicant's midwestern authorized territory, the applicant would not issue a through bill of lading from the point of origin to the point of ultimate destination, but would issue a bill *only* to the last point of applicant's authorized service, such as, Chicago or Milwaukee. Hearings, page 223. The record is barren of a single bill of lading: neither this witness nor any of the shippers called by the applicant produced a bill of lading, although the challenged shipments had taken place in August-September 1953, and it is reasonable to assume that the applicable bills of lading could have been produced for the hearings, which were held shortly thereafter, in October and November 1953. The witness admitted that he was testifying on the basis of his office or accounting copy of the bills, which might well contain notations that were not on the original bills of lading issued to the shipper. Hearings, pages 261, 280–281.

· The following statement appears in the applicant's brief (page 35): " * * * there were no bills of lading produced and there are none in the record. *What was requested to be produced* and what was produced was only 'the accounting copy of our (plaintiffs') delivery ticket.' "

Hearings, page 259. Contrary to the applicant's statement, the record shows that the applicant was requested to produce "the underlying bills", Hearings, pages 231–232, "all the bills that underly [sic] the exhibit", Hearings, page 232, the "bills of lading". Hearings, page 232. Applicant's attorney said that the applicant was "not concerned about furnishing the information nor furnishing the documentary evidence." Hearings, page 247. However, not a single bill of lading was produced.

In this precise connection, it is also not without significance that, while twelve of the shippers called by the applicant testified about westbound shipments, nine of them were not asked a single question about the bills of lading involved (Kaufman, Ferrara, Baron, Goldberg, Salcedo, Kolpin, Mullaley, Trampf and Oslac); a tenth witness (Kimball), when questioned about the bill of lading, said he did not have it, Hearings, page 31; an eleventh witness (Finanger), when asked whether "through bills of lading" were used in the particular shipments in question, said that he did not know about and had never seen the bills of lading, Hearings, pages 334, 345; and the twelfth witness (Sparks), when asked, in connection with westbound shipments originating in the east, whether he receives "a through bill of lading where Lifschultz is concerned," answered: "We receive the original bill of lading on practically all of the shipments." Hearings, page 314.

This being the state of the record on the subject of the bills of lading which had actually been issued by the applicant in the questioned westbound shipments, we turn to Lifschultz' testimony about the three specific shipments which were treated as representative of such westbound shipments.

One shipment was from Corinna, Maine to Waterloo, Iowa, the latter point being outside the applicant's authorized territory. Lifschultz testified that the "accounting copy" of the applicant's "delivery ticket" covered a shipment "from

Corinna, Maine, to Chicago in care of Takin Brothers, Chicago, final destination would be Waterloo, Iowa." Hearings, pages 259, 275, 279. The witness argued that the words "care of Takin Brothers, Chicago," made the Chicago truckman—rather than the Powers Manufacturing Company, Waterloo, Iowa— the "consignee". Hearings, pages 261–264, 275. However, Lifschultz admitted that the applicant's bill of lading, issued to the shipper at Corinna, would show the "destination"; and that the routing words, "rated to Chicago only add beyond charges and tax," which appeared on the copy of the delivery ticket, would not appear on the original bill of lading. Hearings, pages 260–261, 280–281.

Another representative shipment was one from New Ipswich, New Hampshire to Eau Claire, Wisconsin, the latter point being outside the applicant's authorized territory. According to Lifschultz, while the shipment was destined to Farmers Store Company, Eau Claire, Wisconsin, the addition of the words "care Schumacher Motors" made the common carrier the consignee. Hearings, pages 263–264.

The third specific shipment was from Boston, Massachusetts, to Berlin, Wisconsin, also outside the applicant's authorized territory. Lifschultz reiterated his contention that the words "care of Steffke Freight," when added to the name and address of the ultimate consignee (Lamb Skin Slipper Company, Berlin, Wisconsin) indicated that the consignee was the carrier in either Milwaukee or Chicago. Hearings, pages 264–265.

The applicant's effort to picture the truckman (located at an address within the permissible area) as the consignee in place of the real consignee (located outside the permissible area) does not present an arcane mystery. The same effort was reflected in the applicant's exceptions to the examiner's report (exceptions filed April 5, 1954, page 12), where the consignee was not referred to

as such but as "the ultimate recipient in care of the Chicago motor carrier."

The only difference in the actual operation of the applicant between what it did without authority and what it proposes to do if it obtains the authority is that it would be able to charge a through rate instead of a premium rate, and that it would be able to directly publicize that which it now implies in its literature. The physical method of operation whereby the applicant handled shipments destined to points outside its authorized area would be essentially the same, for the applicant would continue to turn over the shipments at the break-bulk point to connecting carriers.

That such is the situation clearly appears from the Lifschultz application, sworn to June 8, 1953 and filed June 10, 1953. Exhibit "A," attached to the application contains the following statement:

"(2) The manner and means of assembly and consolidation of shipments, and the distribution of such consolidated shipments *will be performed in the identical manner as the applicant now performs such service*, namely motor carrier, common and local, from and to local assembly and break-bulk points, and rail common carrier between said assembly and break-bulk points." (Emphasis supplied.)

Exhibit "D" attached to the application recites, *inter alia*, the following:

"At present shippers and consignees in applicant [sic] proposed area of service are paying a premium rate to utilize applicants [sic] expedited service. This premium rate is based on shipments being routed by shippers and consignees via applicants [sic] line to Chicago, Illinois, thence motor carrier beyond. On eastbound shipments these shippers and consignees must route motor carrier to applicants [sic] terminal in Chicago, Illinois.

"This means of routing deprives shippers and consignees [sic] the

privilege of through rates now obtainable via competing freight forwarders."

This is an explicit admission that the applicant was furnishing "expedited service" to shippers and consignees in the "proposed area of service." This admission is in line with the applicant's hearing testimony: that it handles shipments "into a territory beyond" its authority (page 274), to "stations outside of the area which we serve" (page 275); "we also have truckmen who deliver it beyond the territories we are permitted" (page 190).

Behind the verbal facade of the applicant's argumentation, is the stark reality that the applicant did substantially the same business without authority for which it now seeks authority. The only material difference between the applicant's authorized and unauthorized shipments would be the matter of rates. When the applicant made the particular westbound shipments without authority, it charged a premium rate computed on the basis of a combination of rates. The economic disadvantage was offset by the applicant's ability to render expedited service. If the applicant obtains authority, it could publish and charge a less expensive through rate, covering precisely the same movement from the same point of origin to the same point of destination.

Considering the record as a whole, the Commission had ample basis in substantial evidence to have concluded that the applicant, having accepted a shipment for a named consignee at a named destination, was required to issue a through bill of lading covering the shipment to the point of ultimate destination; and that where the latter point was outside the applicant's authorized territory, the applicant exceeded the scope of its permit, in violation of law.

Had the Commission deemed it necessary to make further specific and explicit findings, the Commission would have been justified in concluding: (1) that the applicant had, in fact, issued through bills of lading covering the un-authorized shipments or (2) that the applicant had attempted to evade the requirement of issuing the conventional form of a through bill by the simple but improper expedient of making it appear that the consignee was a person other than the actual consignee, viz., a truckman at a break-bulk point within the applicant's authorized area in whose "care" the consignee was designated. From whatever point the evidence is viewed, the evidence of the applicant's violations is clear and convincing.

■ To determine whether the permit should be granted, the Commission was required to decide whether the applicant was able and willing "properly" to perform the service proposed and whether the proposed service was consistent with the public interest and the national transportation policy, 49 U.S.C.A. § 1010(c). The process of weighing the testimony and drawing the proper inferences brought into play the Commission's expertise, its field experience with trade practices and its knowledge of its own regulations and orders.

The evaluation of the applicant's illegal westbound shipments entailed not only a consideration of those specific transactions *per se*, but also an appraisal of the fact that the applicant had received prior warnings, in 1945 and 1946, that such type of shipments constituted freight forwarder's services in unauthorized territory.

Those warnings were not ambiguous or equivocal. That they were practical caveats and not academic dicta is pointed up by two facts: (1) the applicant was actually a *party* to the two prior proceedings wherein the warnings were given; and (2) precisely the same practice that is involved in the case at bar was discussed in those prior proceedings.

In 1945, Lifschultz Fast Freight Ext.—Eastbound to New England, where the plaintiffs herein were the applicant, the Commission stated, 260 I.C.C. 569, 570–571:

"In support of their application for authority to extend their west-

bound operations to points in southern Illinois and to points in Missouri and Minnesota, applicants show that during the first 5 months of 1944 they forwarded shipments of certain commodities from a number of eastern points to Chicago which were destined to points in southern Illinois and to points in Missouri and Minnesota, and which were transferred at Chicago to rail or motor carriers and moved at combination rates composed of applicants' rates to Chicago and the rates of the rail or motor carriers beyond, and that there was a similar movement of like commodities in December 1944. There were like movements in the intervening months of that year.

"Applicants' bills of lading in respect of those shipments covered the transportation as far as Chicago, only. The routing beyond that point is said to have been specified by the shipper. *Applicants contend that they did not function in the capacity of a forwarder in the movement beyond Chicago because they did not assume responsibility for the shipments beyond that point. Breaking bulk at Chicago and turning over to common carriers the individual shipments destined beyond is nothing more than arrangement for distribution, which is normal practice by forwarders from break-bulk points to ultimate destination.*" (Emphasis supplied.)

In the 1946 proceeding, Brown F. F. Application—Extension of Operations, where the present applicant was a protestant, the Commission quoted from the 1945 Lifschultz case and then said (265 I.C.C. 41, 44):

"Brown's service in connection with these shipments beyond Chicago was that of a freight forwarder * * * *and he should have confined such arrangements to shipments destined to. points within the scope of his authorized territory.*" (Emphasis supplied.)

We agree with what the Commission said in its original report herein, 285 I.C.C. at 576:

"It should be noted that the applicant here was a party to the Brown proceeding, and as such should be fully aware of the Commission's views with respect to the legality of such operations."

and with what the Commission said in its reconsidered report herein, 285 I.C.C. at 664:

"It would seem that the applicant has had ample opportunity to apprise itself of the illegality of its operations in handling shipments to points outside its authorized area."

The Commission's reversal of the examiner herein, "who has observed the witnesses and lived with the case," was not with respect to a finding of fact involving "credibility", cf. Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, but with respect to the application of administrative policy and judgment to the examiner's finding of illegality, a finding that the Commission accepted.

The Commission was dealing with a delicate question of administrative policy: what weight to give past infractions committed by an applicant in determining its qualification and fitness as a permittee. This is a recurring problem that many licensing or regulatory agencies must face and solve in dealing with the issuance, renewal, cancellation and suspension, and extension of permits and licenses. The answer is variable, for it may depend (for example) upon current enforcement problems; and upon the past record of the particular applicant, and the number and seriousness of its past infractions.

Scrutinizing the record as a whole "in the light of all·that the record relevantly presents", Universal Camera Corp. v. National Labor Relations Board, supra, 340 U.S. 488, 71 S.Ct. 465, we find that the Commission's order is sup-

ported by evidence that is substantial, qualitatively and quantitatively; that it is fair and reasonable; and that it represents the application by the Commission of appropriate criteria within the limits of the Commission's statutory powers. Cf. East Texas Motor Freight Lines, Inc., v. Frozen Food Express, 1956, 351 U.S. 49, 76 S.Ct. 574; American Airlines, Inc. v. North American Airlines, Inc., 1956, 351 U.S. 79, 76 S.Ct. 600.

Accordingly, the complaint is dismissed.