An order in accordance with this opinion shall be submitted.

**BALTIMORE SHIPPERS AND RECEIVERS ASSOCIATION, Inc., the Charter Oak Shippers Cooperative Association, Inc., Industrial Shippers Association, Inc., United Shippers Association, Inc., Plaintiffs,**

v.

**PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA and Peter E. Mitchell, William M. Bennett, A. W. Gatov, William Symons, Jr., and Fred P. Morrissey, Defendants.**

**CHARLES J. WORTH DRAYAGE COMPANY, Los Angeles Wholesale Institute, Plaintiffs,**

v.

**PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA and Peter E. Mitchell, William M. Bennett, A. W. Gatov, William Symons, Jr., and Fred P. Morrissey, Defendants.**

**G. I. TRUCKING COMPANY, Redway Truck and Warehouse Company, Plaintiffs,**

v.

**PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA, and Peter E. Mitchell, William M. Bennett, A. W. Gatov, William Symons, Jr., and Fred P. Morrissey, Defendants.**

Civ. Nos. 45076, 45123 and 45576.

United States District Court
N. D. California.
May 23, 1967.

---

Ronald N. Cobert, Grove, Jaskiewicz & Gilliam, Washington, D. C., Howard M. Downs, Howard, Prim, Smith, Rice & Downs, San Francisco, Cal., for plaintiffs Baltimore Shippers and Receivers Association, Inc., The Charter Oak Shippers Cooperative Association, Inc., Industrial Shippers Association, Inc., and United Shippers Association, Inc.

Cecil E. Ricks, Jr., Hill, Farrer & Burrill, Los Angeles, Cal., for plaintiffs Charles J. Worth Drayage Co. and Los Angeles Wholesale Institute.

Donald Murchison, Murchison & Stebbins, Beverly Hills, Cal., for plaintiffs G. I. Trucking Co. and Redway Truck and Warehouse Co.

Mary Moran Pajalich, Bernard A. Peeters, Janice E. Kerr, Public Utilities Commission of the State of California, San Francisco, Cal., for defendants.

Before HAMLIN, Circuit Judge, and BURKE and ZIRPOLI, District Judges.

## ORDER GRANTING PERMANENT INJUNCTION

ZIRPOLI, District Judge.

This is an action brought by two classes of plaintiffs, (1) nonprofit cooperative shippers' associations, and (2) motor carriers who contract with such shippers' associations to deliver their goods from break-bulk points to final destinations, both within the State of California. The action is brought to contest the jurisdiction of defendants to require the carriers

to assess charges in accordance with minimum rate tariffs published by the Public Utilities Commission of the State of California for delivery services performed wholly within commercial zones.[1]

■ The action was instituted in the district court pursuant to the provisions of 28 U.S.C. § 1331(a) because it raises federal questions wherein the alleged matter in controversy exceeds the sum or value of $10,000, and the invoking of a three-judge district court was requested under the provisions of 28 U.S.C. §§ 2281 and 2284 because the requested relief includes enjoining a state official from enforcing a state regulatory scheme. Plaintiffs seek a declaratory judgment that defendants lack jurisdiction to regulate rates in this matter, 28 U.S.C. § 2201, and a permanent injunction preventing defendants from enforcing said rates against plaintiff motor carriers.[2]

The factual setting of the case is as follows: Baltimore Shippers and Receivers Association, Inc., The Charter Oak Shippers Cooperative Association Inc., Industrial Shippers Association, Inc. and United Shippers Association, Inc.; the plaintiffs in No. 45076 and Los Angeles Wholesale Institute, a plaintiff in No. 45123 are nonprofit shippers cooperative associations incorporated in various states. They exist primarily for the purpose of providing shipping services to members at no profit to the association and at a saving over other means available to the shippers. Freight costs to members are reduced, first, by pooling loads for the most efficient shipping over long haul interstate routes and, second, by centralizing assembly and distribution techniques in the pick-up and delivery of the goods. The result is full shipments over the long haul and direct shipments to assembly points and from break-bulk points. The function of these associations is well established and recognized.[3]

Charles Worth Drayage Co., G. I. Trucking Company, and Redway Truck and Warehouse Company are plaintiffs in Nos. 45123 and 45576. They are motor carriers holding certificates of public convenience from defendant Public Utilities Commission of the State of California and are authorized to operate in specified areas within the State of California. Charles Worth Drayage Company operates in an area which roughly corresponds to the San Francisco commercial zone. G. I. Trucking Company is authorized to carry specified cargos within an area which includes Los Angeles, San Diego and such points as Lompoc, thus embracing an area larger than the Los Angeles commercial zone. Redway Truck and Warehouse Company operates within the Los Angeles basin and additionally provides storage facilities within

1. Defendants claim jurisdiction to regulate the rates in question by virtue of Cal.Pub. Util.Code §§ 3506, 3906, which allow regulation "insofar as such regulation is permitted under the provisions of the Constitution and the acts of the Congress of the United States". Provision for establishment of rates is provided for in Cal. Pub.Util.Code §§ 3661–3670 and 4011–4016, pursuant to which schedules of minimum rates have been established.

2. In view of the fact that defendants have definitely acted to assert jurisdiction over plaintiff motor carriers in such manner as will affect plaintiff nonprofit shippers' associations and have threatened the imposition of sanctions against the motor carriers, the case is clearly "ripe for determination" within the requirements of the Declaratory Judgment Act. See Public Service Comm. v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952); Railroad Transfer Service Inc. v. Chicago, 386 U.S. 351, 87 S.Ct. 1095, 18 L.Ed.2d 143 (decided March 27, 1967).

3. The existence and function of nonprofit shippers associations has long been recognized. The provisions of the Freight Forwarder Act exempting nonprofit shippers associations from regulations, 49 U.S.C. § 1002(c) (1), went into effect in 1942. 56 Stat. 284. The stipulated facts show that the plaintiff shippers associations in this case have been shipping into California beginning as early as 1938 (Los Angeles Wholesale Institute) and beginning as late as 1960 (Charter Oak Shippers Cooperative Association, Inc.), with most of them beginning operation in California between 1954 and 1959. (Joint Pretrial Order pp. 15–16.)

that area, which is somewhat larger than the Los Angeles commercial zone.

The parties have stipulated that the entire movement involved here is in interstate commerce, thus the only issue before the court is the propriety of the defendants' attempts to impose a schedule of minimum rates to be charged by the motor carriers to the nonprofit shippers' associations for deliveries made within the commercial zones.

The statutory scheme of regulation under the Interstate Commerce Act involves Part II of the Act, known as the Motor Carrier Act, 49 U.S.C. §§ 301–327 and Part IV of the Act, known as the Freight Forwarders' Act, 49 U.S.C. §§ 1001–1022.

■ The first relevant section is 49 U.S.C. § 303(b) (8), which is part of the section listing exemptions from the comprehensive scheme of regulation of the Motor Carrier Act. The effect of the section is to exempt motor carrier transportation within commercial zones from regulation, with the exception of those provisions which relate to qualifications and maximum hours of service of employees and safety of operation or standards of equipment, until such time as the Commission finds that the national transportation policy makes it necessary to regulate these areas. This section provides:

49 U.S.C. § 303(b)

* * * nor, unless and to the extent that the Commission shall from time to time find that such application is necessary to carry out the national transportation policy declared in this Act, shall the provisions of this chapter, except the provisions of section 304 of this title relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment apply to: (8) The transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and com-

mercially a part of any such municipality or municipalities, * * *.

The second relevant section is 49 U.S.C. § 1002(c) (1), which is part of the section listing exemptions from the regulatory scheme of the Freight Forwarders' Act. The section exempts nonprofits shippers' associations from the regulation and registration requirements which apply to freight forwarders. This section provides:

49 U.S.C. § 1002(c)

(c) The provisions of this chapter shall not be construed to apply (1) to the operations of a shipper, or a group or association of shippers, in consolidating or distributing freight for themselves or for the members thereof, on a nonprofit basis, for the purpose of securing the benefits of carload, truckload, or other volume rates, * * *.

Freight forwarders and nonprofit shippers' associations perform nearly identical functions, except for the fact that the freight forwarders hold themselves out to do business with the public, rather than providing services only for members of an association, and they operate at a profit rather than as a nonprofit service to members. Each handles the consolidation, shipment and distribution of goods, attempting to take advantage of bulk rates and the maximum efficiencies in assembly, distribution and routing techniques.

The last major relevant section is 49 U.S.C. § 1008, which is part of the Freight Forwarder Act allowing common carriers to file tariffs when serving freight forwarders and others similarly situated in assembling and distributing their goods. The section provides:

49 U.S.C. § 1008

Nothing in this Act shall be construed to make it unlawful for common carriers subject to chapters 1, 8, or 12 of this title to establish and maintain assembling rates or charges and/or distribution rates or charges, and classifications, rules, and regulations with respect thereto, applicable to freight forwarders and others who employ or

utilize the instrumentalities or services of such common carriers under like conditions, which differ from other rates or charges, classifications, rules, or regulations which contemporaneously apply with respect to the employment or utilization of the same instrumentalities or services, if such difference is justified by a difference in the respective conditions under which such instrumentalities or services are employed or utilized. For the purposes of this section (1) the term "assembling rates or charges" means rates or charges for the transportation of less-than-carload or less-than-truckload shipments into a point for further movement beyond as part of a carload or truckload shipment, and (2) the term "distribution rates or charges" means rates or charges for the transportion of less-than-carload or less-than-truckload shipments moving from a point into which such shipments have moved as a part of a carload or truckload shipment. The provisions of this section shall not be construed to authorize the establishment of assembling rates or charges or distribution rates or charges covering the line haul transportation between the principal concentration point and the principal break-bulk point.

Historically, it appears that motor carriers at one time performed delivery services from break-bulk points to final destinations entirely within commercial zones without regulation by the California Public Utilities Commission. The Public Utilities Commission then ordered the motor carriers to comply with its minimum prescribed rates, which one or more, if not all, of them did for a period of time. Subsequently, the motor carriers, acting pursuant to 49 U.S.C. § 1008, filed tariffs with the I.C.C. establishing rates generally lower than those minimums prescribed by the Public Utilities Commission, and from that time they have continued to charge in accordance with the tariffs filed with the I.C.C. and have refused to comply with the orders of the Public Utilities Commission, despite the threat of impositions of sanctions, including fines and suspension of operating permits.

## THE LEGAL ISSUES

Plaintiffs contend that defendants are precluded from regulating the rates charged by plaintiff motor carriers to plaintiff nonprofit shippers' associations because (1) Congress has pre-empted the field by virtue of the comprehensive regulatory scheme of the Interstate Commerce Act, (2) the minimum rates established by defendants for deliveries within commercial zones are higher than the assembly and distribution tariffs negotiated between the nonprofit shippers' associations and the motor carriers and constitute an unlawful burden on interstate commerce in violation of Article I, Sect. 8 of the United States Constitution, (3) the defendants' tariffs would amount to a taking of property without due process of law and would violate the equal protection clause of the United States Constitution, and (4) tariffs filed with the Interstate Commerce Commission are valid and in effect within the commercial zones in question, thus precluding regulation by defendants.

Defendants concede that the issues are as stated by plaintiffs, but contend that rather than pre-empting the field, Congress has specifically left regulation in the commercial zones to the states, and even if this is not so, state regulation is necessary to fill the gap formed by the commercial zone exemption. They further contend that there is a valid state interest in a uniform regulatory system, that the prescribed state system does not unreasonably burden interstate commerce, nor violate the due process or equal protection clauses of the United States Constitution, and that the tariffs filed with the I.C.C. are not applicable within commercial zones.

In view of the disposition made by the Court in this matter, it will only be necessary to consider the pre-emption issue and the burden on interstate commerce issue; accordingly arguments made with respect to the other issues will be rele-

vant only insofar as they relate also to the two issues to be discussed.

## THE PRE-EMPTION QUESTION

■■ The merits of pre-emption under the Supremacy Clause, U.S.Const. Art. VI, Par. 2, turn upon an analysis of what is being regulated, by whom, for what purpose, and the statutory language and congressional intent. In this instance, the question involves the regulation of rates by the Public Utilities Commission of the State of California in the interest of maintaining a uniform regulatory system with no "unregulated gaps". The nature of the regulation involved here raises serious questions, for it is economic regulation of interstate commerce in an area which is not, practically speaking, capable of concurrent administration by both the state and federal governments. The famed Shreveport Rate Case, Houston East & West Texas Railway Co. v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1913), indicates that this is an area in which there is a significant federal interest and in which the states must tread lightly.

■ Turning to the question of statutory construction and congressional intent, it becomes apparent that the Interstate Commerce Act has pre-empted the field. Both plaintiffs and defendants argue that the congressional intent as manifested in the legislative history of the statutes favor their respective viewpoints. The court finds that the legislative history is inconclusive.[4] The first and principal statute involved here is 49 U.S.C. § 303(b) (8). This section unambiguously exempts transportation wholly within commercial zones from regulation, but does not specifically spell out whether or not state regulation is envisioned or permitted. Some aid in interpreting this section can be found by analogy to a similar exemption provision of the Motor Carrier Act.

Pre-emption has been found under 49 U.S.C. § 303(b) (6), which exempts motor vehicles used to carry nonmanufactured agricultural commodities. State Corporation Comm. v. Bartlett, 338 F.2d 495 (10th Cir. 1964). Bartlett involved the transportation of grain within the State of Kansas to a processing point from which it was ultimately shipped in interstate commerce. After finding that the initial shipment was in the flow of commerce and thus considered to be in interstate commerce, the court held that there was pre-emption. Defendants suggest that the case is distinguishable because it dealt with an agricultural exemption with a peculiar legislative history which distinguishes it from the commercial zone exemption. This court disagrees. Although there is mention of the legislative history of the agricultural exemption, the holding appears to be grounded primarily upon the distinction between rate regulation and other types of regulation practiced by the states. The opinion indicates that the states' interest in highway safety, police power, health and safety and prevention of fraud are much greater than in the

4. With respect to 49 U.S.C. § 303(b) (8), Senator Wheeler who introduced the bill, appears to have envisioned state regulation when he explained its provisions as follows:

Furthermore, an exemption is made, unless the Interstate Commerce Commission finds that the law cannot be made to work without its inclusion to some extent, of the transportation of property locally or between contiguous municipalities or commercial zones, as between New York and New Jersey, and also, for instance, as between Washington and Alexandria, and other contiguous cities where the transportation is regulated by the local governments themselves. 79 Cong.Rec. Part 5, p. 5650.

On the other hand, the House debates indicate that a state could not regulate any interstate commerce. It was stated during the debates:

In the case of Buck v. Kuykendall, (267 U.S. 307, [45 S.Ct. 324, 69 L.Ed. 623]) the court held that a State could not regulate motor carriers operating in interstate commerce, and that the matter of control of carriers in interstate commerce was entirely in the hands of Congress to provide for Federal regulation.

This decision left the door wide open. * * * 79 Cong.Rec. Part II, p. 12206.

area of rate regulation, which it viewed as having "commercial aims". State Corporations Comm. v. Bartlett, supra, 338 F.2d at 498–499. Certainly, the instant case has overtones of commercial regulation, however sincere and highly motivated the defendants may be. It is clear that forcing plaintiff motor carriers to charge higher rates to plaintiff nonprofit shippers results in some competitive advantage to local manufacturers and producers of goods by increasing the costs to distant sellers in the marketing of their goods in California commercial zones.

■ Defendants maintain that California has a legitimate interest in maintaining minimum rates and regulation to see that sufficient marginal profit is made to allow the motor carriers to maintain their equipment in a safe manner and to protect the economic welfare of California motor carriers by not allowing them to engage in cutthroat competition with each other for the business of the nonprofit shippers' associations.

The United States Supreme Court recently considered similar arguments with respect to terminal zone transfer service which is regulated by the Interstate Commerce Act, but exempted from regulation under the Motor Carrier Act by 49 U.S.C. § 302(c) (2). The Court held that the City of Chicago was not free to impose a comprehensive licensing scheme under the guise of general safety regulations. Railroad Transfer Service Inc. v. Chicago, 386 U.S. 351, 87 S.Ct. 1095, 18 L.Ed.2d 143 (decided March 27, 1967). In the instant case no one has disputed the jurisdiction of defendants to directly impose reasonable safety regulations, but they are not free to accomplish this alleged goal indirectly through such a method as rate regulation.

■ Defendants' contention that the regulation can be justified as a protection against destructive competition is without merit. Defendants introduced no evidence to establish that harm of this nature had occurred, but assuming arguendo that such a showing had been made, the interest the State asserts is one of economic protection for common carriers and does not come within the health, safety and welfare, or police power interests which have been recognized to have validity.

Further support for the finding that there is pre-emption is found in the Freight Forwarder Act. As previously discussed, the functions performed by freight forwarders and nonprofit shippers' associations are nearly identical, with the exception of the profit motive and service to the general public in the case of the freight forwarder as compared with the nonprofit shippers' association. Were it not for this distinction recognized in 49 U.S.C. § 1002(c) (1), nonprofit shippers' associations would be treated as freight forwarders. Motor carriers performing delivery services for freight forwarders within commercial zones in the State of California are not regulated by defendants because they are precluded from such regulation by virtue of the provisions of 49 U.S.C. § 302(c) (1), which indicates that motor carriers are exempted from regulation under the act when performing services for freight forwarders within "terminal areas" [which terminal areas are defined by the same limits as the commercial zones of 49 U.S.C. § 303 (b) (8), see Sea-Land Service, Inc. v. United States, 222 F.Supp. 558 (D.C.Del. 1963)]. Thus, the entire operation is subject to regulation under the Freight Forwarder Act. Regulation of these services, which are the same as those provided for nonprofit shippers' associations, by the states is thus prohibited by direct statutory pre-emption. Since nonprofit shippers' associations are exempted from treatment as freight forwarders, 49 U.S.C. § 1002(c) (1), the status of regulation within the commercial zones becomes a matter of significance if there is no general pre-emption of commercial zones by virtue of the Motor Carrier Act.

Assuming that the Motor Carrier Act alone has not pre-empted the field of commercial zone transportation, it appears

that, nonetheless, the provisions of the Freight Forwarder Act relating to non-profit shippers' associations and motor carriers providing services for them clearly establish pre-emption.[5] The language of 49 U.S.C. § 1002(c) (1) indicates that nonprofit shippers' associations enjoy a preferred status within the scheme of national transportation. The exemption is made applicable to " * * * the operations of a shipper, or a group or association of shippers, in consolidating *or distributing* freight for themselves or for the members thereof, on a nonprofit basis, *for the purpose of securing the benefits of carload, truckload, or other volume rates * * * *"* (emphasis added). It is clear that the statute recognizes a benefit and endorses that benefit by exemption and that part of the benefit is in the distribution process. The activities of the motor carriers in delivery of the goods from break-bulk points to final destination is certainly an integral part of the distribution process, cf. Lifschultz v. United States, 144 F.Supp. 606 (S.D.N.Y.1956), and it is clear that benefits are obtained by consolidated direct line distribution methods beyond break-bulk points.

■ Another section of the Freight Forwarder Act offers still further support for pre-emption. This is 49 U.S.C. § 1008, the section under which the plaintiff carriers have filed tariffs with the Interstate Commerce Commission. The application of this section is permissive, rather than mandatory, but it allows the establishment of assembly and distribution rates by common carriers serving " * * * freight forwarders and *others who employ or utilize the instrumentalities or services of such common carriers under like conditions * * * *"*. Although the language does not refer specifically to nonprofit shippers' associations, they certainly come within the category of others who operate under like conditions. Consequently, if it is permissible for motor carriers to file tariffs with the I.C.C. when serving nonprofit shippers' associations, it seems most likely that this permission would include tariffs for deliveries wholly within commercial zones in the same manner it does for freight forwarders, where the services performed by the motor carriers is practically identical.

■ Although pre-emption will not be lightly inferred unless the nature of the subject permits no other conclusion or Congress has unmistakenly so ordained, Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), the court finds that the comprehensive regulatory scheme of the Interstate Commerce Act, including both the Motor Carrier Act, Cf. State Corporations Comm. v. Bartlett, supra, and the Freight Forwarder Act and the nature of the subject matter sought to be regulated require a finding that the field has been pre-empted by federal regulation.

This finding is made not only in the three-judge capacity of the court, but also the original district judge finds individually that he would reach the same conclusion with respect to pre-emption. The individual finding is made to satisfy the jurisdictional requirement set forth in Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). The *Swift* case requires a substantial question of constitutional law to support three judge jurisdiction and holds that a finding solely on the grounds that the Supremacy Clause of the United States Constitution, Art. VI, has pre-empted the field is not such a question.

The court, sitting in its three-judge capacity, finds that the constitutional question presented under the Commerce Clause, U.S.Const. Art. I, Sect. 8, is not insubstantial and proceeds to consider the issue.

## THE COMMERCE CLAUSE QUESTION

The court is of the opinion and finds that even in the absence of pre-emption,

---

5. The court expresses no opinion on the question of whether the Motor Carrier Act alone pre-empts the field in view of the more persuasive reasoning for pre-emption found by reading Parts II and IV of the Act together.

the scheme of rate regulation defendants seek to impose violates the Commerce Clause of the United States Constitution. U.S.Const. Art. I, Sect. 8.

In making this determination, the court is faced with essentially a balancing process to determine the relative importance of the competing interests. An analysis of the evidence shows that the imposition of California minimum rate tariffs will result in substantially higher costs to out-of-state shippers who ship through nonprofit shippers' associations and will result in a decrease in the flow of traffic into California. Defendants maintain that the rates are nonetheless justified, since the matter is one of primary local concern, and the State has a legitimate interest in maintaining a fully regulated system which would be disrupted by lack of direct regulation.

 The testimony of Mr. A. E. Norrbom clearly establishes and defendants do not dispute that the distribution charges under the California minimum rate tariffs would be higher than those under the contract rates or assembly and distribution tariffs plaintiff motor carriers presently operate under. Defendants do not accept the precise figures and methods used by Mr. Norrbom in arriving at his comparisons, but they have made no specific studies themselves which show any substantial difference.[6]

(See transcript, pp. 536–541). Plaintiffs have shown that defendants' tariffs would result in increases in delivery costs within the commercial zones of from approximately 24 per cent to 95 per cent, with the average increase around 80 per cent. (Deposition of Norrbom, pp. 17–18; Plaintiffs' Exh. 6–9). The testimony of Mr. Saunders further establishes that these increases in local delivery costs would increase the total delivery costs of the nonprofit shippers' associations in the neighborhood of 12 per cent to 15 per cent. (Transcript, pp. 26–27).

Accordingly, there can be no doubt that the rate regulation by the State of California would result in a substantial economic burden on commerce. The law is clear that a state may not, in the absence of compelling reasons, impose a direct economic burden on commerce through the establishment of rates. Railroad Comm. of Ohio v. Worthington, 225 U.S. 101, 108, 32 S.Ct. 653, 56 L.Ed. 1004 (1912); Wilmington Transportation Co. v. Railroad Comm. of Calif., 236 U.S. 151, 35 S.Ct. 276, 59 L.Ed. 508 (1914). It has also long been established that "the state cannot fix the relation of the carrier's interstate and intrastate charges without directly interfering with the former, unless it simply follows the standard set by Federal authority." The Shreveport Rate Case, Houston East & West Texas Railway Co. v. United States, 234 U.S. 342, 354, 34 S.Ct. 833, 837, 58 L.Ed. 1341 (1914). While there has been no federal rate set in this instance, there is a clear federal policy favoring nonprofit shippers' association expressed in 49 U.S.C. § 1002(c) (1) even by comparison with freight forwarders, and freight forwarders are allowed to file assembly and distribution tariffs and negotiate rates in a manner like that in which plaintiffs desire to operate. 49 U.S.C. §§ 302(c) (2), 1008 and 1009. It is the view of the court that the effect is the same as that prohibited in the *Shreveport Rate* Case and is an unconstitutional burden on commerce.

 This finding is further supported by evidence of violations of the "long and short haul principle". The testimony of Mr. Norrbom indicates and the defendants' expert, Mr. Lane, agrees that instances would occur under the California tariffs where a motor carrier delivering goods from within a commercial zone would be forced to charge higher rates for the short haul deliveries within the commercial zone than for

6. Considerable testimony was elicited at trial on the question of whether the California rate structure was designed to be applied to motor carriers performing serv-ices for nonprofit shippers' associations; in view of the disposition made, the court finds no need to reach that question.

longer haul deliveries along the same route but outside of the commercial zone. (Deposition of Norrbom, pp. 27–30, Transcript, p. 630.) In the latter situation involving longer haul deliveries along the same route but outside the commercial zone, it is clear that the state is prohibited from regulation by the Motor Carrier Act.[7] This amounts to a direct and discriminatory burden on interstate commerce.

■ A further basis for finding an unconstitutional burden on commerce is found in the evidence introduced at trial that defendants' rate structure would result in an interference with the free flow of commerce.

■ Mr. Saunders testified that the increase in costs would result in a drying up of some of the traffic and an impairment of the ability of some out-of-state producers to compete in the California market. (Transcript, pp. 27–30, 33). He states in testimony that was nowhere effectively rebutted that "the California regulation would impose a trade barrier by artificially impairing the ability of producers in other states to compete with those in California." (Transcript, p. 30). The commerce clause clearly protects interstate commerce from actions by any state which result in an unreasonable disruption of the free flow of commerce. Buck v. Kuykendall, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925). Defendants rely upon South Carolina State Highway Dept. v. Barnwell Bros., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938), for the proposition that even a significant interference with the flow of commerce can be sustained. That case is distinguishable in that Barnwell dealt with a state interest in the safety and maintenance of its highways. A safety interest is high or-

der of interest on the scale of state interests, but there is and can be no such interest directly allied to the fixing of minimum rates in this case. It is clear that any indirect safety benefit which may accrue to the state through the imposition of higher tariffs and consequently higher profits will not suffice to support the measure as a safety measure. Cf. Lemke v. Farmers' Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458 (1922).

Defendants' contention that there is a significant state interest in uniformity of regulation within the State of California is first without factual support, and second, not the type of interest which is recognized under the commerce clause cases. Defendants' own witness, Mr. Kaspar, testified that the traffic of motor carriers delivering goods for nonprofit shippers' associations within commercial zones amounted to less than ¾ of 1 per cent of the overall freight traffic in California. (Transcript, p. 696). The cases cited by defendants to support state regulation despite some burden have all dealt with a different order of state interest. See Milk Control Bd. of Pa. v. Eisenberg Farms, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752 (1939), (incidental burden, strong state interest in health); Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1938), (price control attacked on due process and equal protection grounds). Defendants' reliance on Wilmington Transportation Co. v. Railroad Comm. of California, 236 U.S. 151, 35 S.Ct. 276, 59 L.Ed. 508 (1915), requires some special comment. *Wilmington* involved state regulation of the rates charged by ferries serving passengers in transit between San Pedro on the California mainland and Avalon on Santa

---

7. Section 303(b) (8) of Title 49 of the United States Code only exempts traffic within commercial zones, thus traffic traveling outside of commercial zones, though originating within commercial zones, is under the jurisdiction of the Interstate Commerce Commission. Carriers are permitted to file tariffs for this traffic under 49 U.S.C. § 1008. The evidence ad-

duced at trial indicates that some motor carriers do not now file tariffs with the Interstate Commerce Commission, but rely upon the nonprofit shippers' association exemption, 49 U.S.C. § 1002(c) (1), to allow completely free contracting for rates. (See also 49 U.S.C. § 1009). The propriety of this practice is in no way before this court.

Catalina Island, both of which places were within Los Angeles County. The court upheld state regulation in this area despite the fact the voyage involved traversing the high seas. Since both ports were within the same state and county, there is an apparent analogy to transportation within a commercial zone; however, the analogy is not controlling. In *Wilmington*, the Court carefully pointed out that they were not dealing with property involved in the course of continuous transit between states. Wilmington Transportation Co. v. Railroad Comm. of California, supra, at 156, 35 S.Ct. 276. The case is thus distinguishable as one of purely local nature that only incidentally happens to pass in interstate commerce in a very technical sense. Similarly, Port Richmond & Bergen Point Ferry v. Board of Chosen Freeholders, 234 U.S. 317, 34 S.Ct. 821, 58 L.Ed. 1330 (1914), involved primarily local transportation and is distinguishable.

The court thus concludes that imposition of the minimum rates established by the Public Utilities Commission of the State of California amounts to an unreasonable and unconstitutional burden on interstate commerce.

In view of the findings on pre-emption and the burden on interstate commerce, it is unnecessary to reach the additional contentions raised by plaintiffs that defendants' rates would violate the equal protection and due process clauses. U.S. Const. Amend. XIV, Sect. 1, and likewise, to reach the question posed by plaintiff motor carriers regarding the filing of tariffs with the Interstate Commerce Commission.

Accordingly, plaintiffs' prayer for declaratory relief and a permanent injunction is granted. It is ordered that defendants be permanently enjoined from enforcing minimum rates published under the authority of the California Public Utilities Code upon plaintiffs.

This opinion and order constitute the court's findings of fact and conclusions of law in accordance with F.R.Civ.P. 52 (a).